69 U.S. 649 (1864)
2 Wall. 649
THE FOSSAT OR QUICKSILVER MINE CASE.
Supreme Court of United States.

*678 Messrs. Bates, A.G., and Wills, special counsel for the United States.
Messrs. J.B. Williams and Carlisle, for the representatives of Berreyesa.
Mr. Black, with whom was Mr. Cushing, for Fossat, representative of Larios.
*704 Mr. Justice NELSON delivered the opinion of the court.
This case has already been twice before the court.[*] It was very ably and elaborately argued at the bar on both occasions, and fully considered by the court. There is very little, if anything, left that is new to be considered or decided upon the present argument.
The main question in contestation in the two preceding arguments, and which has again been ably and elaborately presented, is that involved in the settlement of the southern boundary of the grant, whether or not the foot of the Sierra, the mountain range, or the Lomas Bajas, a range of low hills north of it, constituted this southern boundary. The Board *705 of Commissioners adopted the Sierra, and its decree, in this respect, was confirmed by the District Court. On an appeal to this court the same line was fully recognized.
The court, after referring to the lines of the grant to Larios, and to the Sierra, as described in the grant to Berreyesa, the west line of which was a line in common between the two ranches, as agreed upon between the parties previous to the issue of either grant by the Governor, say, "The southern, western, and eastern boundaries of the land granted to Larios are well defined, and the objects exist by which those limits can be ascertained. There is no call in the grant for a northern boundary, nor is there any reference to the diseño for any natural object, or other descriptive call to ascertain it. The grant itself furnishes no other criterion for determining that boundary than the limitation of quantity, as expressed in the third condition." The decree of the District Court was reversed, for the reason that it confirmed to the claimant a larger quantity of land than was embraced in the grant, and the cause was remitted to that court to enter a decree in conformity with the opinion. As it became necessary to remand the cause for the purpose of locating upon the ground the quantity as limited by the above decision, authority was given to the District Court to fix the boundaries from the evidence on file, and such other evidence as might be produced before it. On filing the mandate in the District Court, the counsel for the United States applied for liberty to furnish further evidence, which application was granted. Several witnesses were examined accordingly, their testimony relating chiefly to the southern boundary of the tract, as described in the grant. The court had suspended the entry of the decree, in pursuance of the mandate, until after this evidence was furnished. The decree was filed and entered October 18, 1858. It reaffirmed the Sierra, or mountain range, as the southern boundary, and directed the line to be so drawn as to include the bottom and low lands along the base of this Sierra, and declared the eastern line to be a straight line commencing at the junction of the Arroyo Seco and the Arroyo de Alamitos, and thence *706 running southward to the aforesaid Sierra, or mountain range, passing by the eastern point of the small hill situated in the centre of the cañada, which was designated in the grants to Larios and Berreyesa, being the same line agreed upon between them as a division-line, and which is delineated by a dotted line on the diseño or map in the expediente of Berreyesa. It declares also the western boundary to be the Arroyo Seco, which is the continuation of a stream known as the Arroyo Capitancillos, and the northern boundary to be a line or lines located, at the election of the grantee, or his assigns, under the restrictions established for the location and survey of private land claims in California, in such manner that, between the northern, southern, eastern, and western lines, there shall be contained one league of land, and no more.
The decree then fixes the western line of Fossat, which is a line between him and the Guadalupe Mining Company, that owns one-fourth of the league granted to Larios, and confirms to Fossat the remaining three-fourths within the lines above declared.
This decree was appealed from by the United States to this court.[*] The court dismissed the appeal as prematurely brought, the decree below not being a final decree.
In the opinion dismissing the appeal, it is said, after referring to the case when previously before us,[] "The court had determined that the grant under which the plaintiff claimed land in California was valid for one league, to be taken within the southern, western, and eastern boundaries desig nated therein, at the election of the grantee and his assigns, and adds, the District Court, in conformity with the directions of the decree, declared the external lines on three sides of the tract claimed, leaving the other line to be completed by a survey to be made. From the decree, in this form, the United States have appealed."
The court then answers the objections taken to the motion *707 to dismiss, which were, that the inquiries and decrees of the Board of Land Commissioners and of the District Court could relate only to the question of the validity of the claim, and not to questions of location, extent, and boundary, and that the District Court had gone in its decree to the full limit of its jurisdiction. These objections, after a full consideration of the acts of Congress, of adjudged cases, and of the principles upon which the court was bound to proceed, were overruled; and the court observe that, in addition to the questions upon the validity of the title, there may arise questions of extent, quantity, location, boundary, and legal operation, that are equally essential in determining the validity of the claim; and that, in affirming a claim to land under the Spanish or Mexican grants to be valid within the law of nations, the stipulations of the treaty of Guadalupe Hidalgo, and the usages of these governments, we imply something more than that certain papers are genuine, legal, and translative of property. We affirm ownership and possession of land of definite boundaries rightfully attach to the grantee. And in closing the opinion, it is observed that, "After the authenticity of the grant is ascertained in this court, and a reference has been made to the District Court to determine the external bounds of the grant, in order that the final confirmation may be made, we cannot understand upon what principle an appeal can be claimed until the whole of the directions of this court are complied with, and that decree made. It would lead to vexatious and unjust delays to sanction such a practice."
It will be seen, from this opinion, that the reasons for the conclusion that the decree of the District Court was not a final one, were, that the land granted had not been located on the ground by fixed and definite boundaries. A survey of the tract was indispensable in order to locate the northern boundary. That boundary was not given in the descriptive calls of the grant, and depended upon the limitation of the quantity; and until the survey of the three lines given, namely, the eastern, southern, and western, and the three-fourths of a league of land located within them, the northern *708 boundary could not be ascertained or fixed. The location of this line was an essential step to be taken on the part of the District Court, in fulfilment of the duty enjoined by the mandate of this court. In the interpretation of that mandate, this court, in its opinion,[*] observes, "The District Court, in conformity with the directions of the decree, declared the external lines on three sides of the tract claimed, leaving the other line to be completed by a survey to be made." That had not been done.
On the filing of the mandate of dismissal of the appeal in the District Court, an order was made directing the Surveyor-General to proceed and survey the land confirmed in conformity with the decree as entered in that court, and which, as we have seen, was entered on the 18th October, 1858. That survey was made and is found in the record. It was approved by the Surveyor-General 18th December, 1860, and filed in the court below 22d January, 1861. We have also the testimony of Hays, the deputy surveyor, who surveyed the lines on the ground, and constructed the map; also of Conway, a clerk in the office, who assisted him, and of Mandeville, the Surveyor-General, who approved of the map, showing that the survey and map were made in strict conformity with the boundaries of the tract as given in the decree, of which they had a copy, and followed as their guide.
This survey having been made in conformity with the decree of the District Court, entered in pursuance of our mandate, would, doubtless, have closed this controversy, had it not been for the act of Congress passed 14th June, 1860, after the entry of the decree in the District Court, but before the survey of the tract by the Surveyor-General. The act purports to be an act to regulate the jurisdiction of the District Courts of the United States in California, in regard to the survey and location of confirmed private land claims. It authorizes the court to allow intervenors, not parties to the record, to appear and contest the survey, or in the words *709 of the act, "to show the true and proper location of the claim," and for that purpose to produce evidence before the court, and directs that, "on the proofs and allegations, the court shall render judgment thereon." Any party dissatisfied with the decision may appeal to this court within the period of six months.
Under this act several parties intervened, and much testimony was furnished to the court in relation to the survey and location of the tract by the Surveyor-General, and which is found in the record, embracing some two hundred and twenty pages. And on the 16th November, 1861, the court entered an order reforming the survey, as to the eastern line. Instead of adopting the eastern line of the survey, which had been located as directed in its decree, and which was a straight line from the point of beginning to the termination at the Sierra (the southern boundary), passing by the eastern point or base of the low hill in the centre of the cañada, the court directed that, from the base of the low hill, the line south should be deflected fifty-five degrees west, until it reached a given point or object, and from thence south thirty-four degrees west till it reached the Sierra, or mountain range. Instead of a straight line for the eastern boundary, three lines were directed to be run, at considerable angles to each other, between the starting-point and the termination. This direction of the court not only reformed the survey of the tract as made by the Surveyor-General, but reformed the decree itself of the court, entered on the 18th October, 1858, in pursuance of which the survey had been made. The court assumed that the survey and location of the tract was not to be governed by the decree, but, on the contrary, that it was open to the court to revise, alter, and change it at discretion, and to require the Surveyor-General to conform his survey and location to any new or amended decree; for, certainly, if it was competent to change this eastern line from that settled in the decree, it was equally competent for it to change every other line or boundary as there described and fixed.
Now, it must be remembered, that this decree of the District *710 Court designating with great exactness this eastern line, with such exactness that the Surveyor-General had no difficulty in its location, was entered in pursuance of, and in accordance with, the mandate of this court, and by which that court was instructed at the time of the dismissal of the appeal, that the three external lines declared in it were in conformity with the opinion of this court; and that the other line  the north line  only, remained to be completed by a survey to be made, and that this line was to be governed by quantity, which quantity had been previously determined.
This radical change, therefore, of the eastern line of the tract, involves something more than a change by the court of its own decree; it is the change of a decree entered in conformity with the mandate of this court. But we do not intend to place any particular stress upon this view, for we hold that it is not competent for the court to depart from its own decree in the exercise of the power conferred by the act of the 14th June, 1860. The duty enjoined is not a rehearing of the decree on its merits, it is to execute it, to fix the lines on the ground in conformity with the decree entered in the case. The decree is not only the foundation of the validity of the grant, but of the proceedings in the survey and location of land confirmed. But, independently of this view, which we regard as conclusive, and even if the question was an open one, this alteration is wholly unsustainable. Indeed, the learned counsel for the appellees did not undertake to sustain it on the argument. The fact was admitted that the line was a straight one between the two termini.
An attempt, however, was made to sustain the termination of the line at the same point on the Sierra, or southern boundary, consistent with the line being run straight from the point of starting. This is sought to be accomplished by disregarding one of the descriptive calls in the line, a natural object, namely, the eastern base of the low hill, an object which must have been visible to the eyes of both Larios and Berreyesa at the time they agreed upon the settlement of the line as their common boundary. But even this departure from the grant will not answer the purpose. There is *711 still the difficulty of getting at the point of termination at the foot of the Sierra. That point or corner must first be ascertained before a straight line can be extended to it from the junction of the two creeks, the starting-point. The only description in the grant by which this point of termination can be ascertained is by running a line from the junction of the two creeks past the eastern base of the low hill southward to the Sierra. It is the extension of this line, in the manner described, by which this corner on the Sierra is reached and identified. Any one seeking to ascertain it without the use of these means, will find himself without compass or guide.
Now, this corner the learned counsel for the appellees propose to fix arbitrarily or by conjecture, and then by drawing a line from the junction of the two creeks to it, a straight line is obtained, and by this process of ascertaining the corner at the Sierra, it is made easy to select the one reached by the crooked line of the court below. But then, the line, as is admitted, instead of passing by the eastern base of the low hill, would cut it not far from or even west of its centre.
The court below, as is apparent, yielded to this argument, so far as respected the arbitrary selection of the corner at the Sierra, but refused to depart from the call in the line for the eastern point of the low hill. Hence, the crooked line between that point and the termination. The crooked line has the advantage over the straight one of the learned counsel, as it observes one of the principal calls in the grant. Theirs observes none of them except the starting-point.
There are two objections to this view, either of which is fatal.
The first, the point selected at the foot of the Sierra for a corner, is arbitrary and conjectural, and in contradiction to the clear description in the grant. And, second, it disregards one of the principal and most controlling calls in it, the eastern base of the low hill.
Our conclusion upon this branch of the case is, first, that the court erred in departing from the eastern boundary, as *712 specifically described and fixed in the decree of the 18th October, 1858. And, second, that irrespective of that decree, the line in the survey and location approved by the Surveyor-General, 18th December, 1860, is the true eastern line of the land confirmed.
The only party that appealed from this order or decree of the District Court, in respect to the survey and location, as appears from the record, is the present claimant. He insists upon the correctness of the first survey by the Surveyor-General, and that the alteration by the court of the eastern line, and consequently of the other lines made necessary by this change, are erroneous.
The United States did not appeal. They are, however, a party to the record as appellees, and appeared by counsel on the argument in this court, and took objections to the survey and location, mainly on the ground that the proceedings under the act of 1860 were not judicial, but purely executive and ministerial, and, as a consequence, that the appeal from the order or decree of the District Court, regulating the survey and location, ought not to be entertained; that the courts could only determine the validity of the grant, leaving its survey and location to the Executive Department of the Government. In other words, that the act of 1860 was unconstitutional and void. We need only refer to the opinion of this court, in the present case, the second time it was before us, as presenting a conclusive refutation of these several positions. The fundamental error in the argument is, in assuming that the survey and location of the land confirmed are not proceedings under the control of the court rendering the decree, and hence not a part of the judicial action of the court. These proceedings are simply in execution of the decree, which execution is as much the duty of the court, and as much within its competency, as the hearing of the cause and the rendition of its judgment; as much so as the execution of any other judgment or decree rendered by the court.
This power has been exercised by the court ever since the *713 Spanish and French land claims were placed under its jurisdiction, as may be seen by the cases referred to in the opinion of the court in this case, when last before us,[*] and in many others to be found in the reports. The powers of the Surveyor-General under these acts were as extensive and as well defined as under the act of 1851. The act of 1860 did not enlarge or in any way affect his powers. They remained the same as before.
The first act of Congress, March 2d, 1805,[] amended March 3d, 1806, establishing a Board of Commissioners to settle private French and Spanish land claims, under the Louisiana treaty, provided for a survey of the confirmed tract by the Surveyor-General, under the direction of the commissioners.
And the act of 26th March, 1824, the first act which placed these land claims under the jurisdiction of the United States District Courts, provided that a copy of the decree of the confirmed claim should be delivered to the Surveyor-General, and that he should cause the land specified in the decree to be surveyed, and which survey, being presented to the Commissioner of the Land Office by the claimant, entitled him to a patent. Under this act and other similar acts, the cases referred to in 21 Howard arose, and in which this court entertained appeals from decrees in the District Courts upon the survey and location of confirmed claims. The 13th section of the act of 1851 corresponds substantially with the above provision of the act of 1824. It makes it the duty of the Surveyor-General to cause all confirmed claims to be accurately surveyed, and provides that the claimant, on presenting a copy of the decree of confirmation and a plat of survey to the General Land Office, a patent shall issue. It also confers upon this officer the powers of the registers and receivers, under the 5th section of the act of March 3d, 1831,[] which relates simply to the case of interfering confirmed claims.
*714 The duty of the Surveyor-General, under all these acts, is to survey and locate the confirmed tract, in conformity with the decree. It is the only guide which is furnished to him; and one of the first instructions from the Land Office is as follows: "In the survey of finally confirmed claims you must be strictly governed by the decree of confirmation; and when the terms of such decree are specific, they must be exactly observed in fixing the locality of and surveying the claim." This instruction was given under the act of 1851, and in relation to the private land claims of California; and it was in accordance with this instruction that the survey of the present claim was made and approved by the Surveyor-General, 20th December, 1860, and filed in the court below 22d January following, and which was reformed by the court by the alteration of the eastern line, as already explained. Those who are desirous of putting the Land Office above the decrees of the courts, should at least be satisfied with this instruction of the department, if not with the decrees.
It has been argued, that the lines of the tract, as given in the grant, were out-boundaries, like the case of Fremont and others which have been before the court, and embraced a larger area of land than the one square league, and that the survey and location should not have been controlled by these lines as specific boundaries.
The first answer to this objection is, admitting it to be true, it can have no influence upon the judgment to be given by this court. These lines have been adjudicated and settled, and incorporated in the decree of the District Court, and which decree was entered in pursuance of the mandate of this court, and no appeal has been taken from that decree. It is said, however, that the decree was not in conformity with the mandate. If so, the party aggrieved should have appealed, and this court would have corrected the error. This is common learning, and needs no authority.
The error, it would seem, was not discovered until the survey; but this affords no reason for violating established law. The more natural conclusion, we think, is that the *715 omission to appeal was the result of a conviction the decree was right. It was entered after much testimony taken in respect to it, and full argument on behalf of the very parties who now set up this pretext.
The second answer to the objection is, that the lines in the grant are not out-boundaries in the sense of the cases referred to.
This court said, when the case was first before it, "The southern, western, and eastern boundaries of the land granted to Larios are well defined, and the objects exist by which these limits can be ascertained. There is no call in the grant for a northern boundary, nor is there any reference to the diseño for any natural object, or other descriptive call to ascertain it. The grant furnishes no other criterion for determining that boundary than the limitation of the quantity as expressed in the third condition." And the same opinion is substantially expressed by the court when before it the second time. The court say: "The District Court, in conformity with the directions of the decree, declared the external lines on three sides of the tract claimed, leaving the other line to be completed by a survey to be made." It should be remembered this was said of the decree now in question, which was then before the court. The observations were made in express reference to it.
But, independently of this, and looking at the question as an original one, there can be no reasonable doubt about it. The eastern line was in dispute between the two adjoining rancheros (Larios and Berreyesa), and which was carried before the public authorities for settlement, and there finally adjusted by the agreement of the parties. A line could hardly be made more specific. A boundary settled and fixed after litigation by the adjoining owners. The western boundary is a well-known natural object, the Arroyo Seco  a creek. The southern, the Sierra, or mountain range; and no boundary on the north. The grant was of quantity, and of necessity this boundary must be determined by the limitation of that quantity between the lines given *716 It is true, in the second condition of the grant it is said, the judge who shall give possession of the land shall have it measured in conformity to law, leaving the sobrante, the surplus, to the nation. But this is a formal condition, to be found, for abundant caution, in every Mexican grant. There is no sobrante here, nor could the judge have measured the grant according to the law or ordinance in a way to have any. Aside, therefore, from the lines being fixed and specific according to the opinion of this court, and of the decree of the court below in pursuance of it, there could be no reasonable doubt upon the question, if an original one.
Much has been said on the argument in respect to the first locations and residences of the claimants on the low lands outside of this northern boundary, and as to the duty of the court to so locate this boundary as to include these possessions. But the answer to these suggestions is obvious. At the time these claimants took possession of the tract, they supposed they were entitled to a larger quantity of land than one league,  nearly two leagues,  which would have carried this line over and beyond these possessions. But this court cut down the quantity to one league, and hence these possessions are, with the exception of the old house of Larios, necessarily excluded. It is also said that sales were made to third persons in the valley outside of the line, and that their title should be protected. But they are not complaining of the survey or location as made in pursuance of the decree. Some of them appeared before the District Court, and filed objections to it, but have since withdrawn and abandoned them. We do not refer to these objections as entitled to any particular weight or importance, but because the explanations are at hand, for we place the decision of the case upon the ground that the boundaries of the tract have been settled by the final decree of a court of competent jurisdiction, and until that decision is got rid of, there is an end of the controversy.
OUR CONCLUSION is that the order or decree of the court below, of the 16th November, 1861, which set aside the survey *717 of the tract approved by the Surveyor-General, 18th December, 1860, and which order or decree was directed to be filed nunc pro tunc, as of the 31st October, 1861, and, also, the order or decree of the 16th November, 1861, confirming the new survey, which was filed in court by the Surveyor-General on 11th of that month, be reversed and annulled, and that the cause be remitted to the court below, with directions to that court to enter a decree confirming the survey of the Surveyor-General, approved 18th December, 1860, and filed in court 22d January following.
The only objection that can be made to this survey is, that the tract is not located in a compact body. A comparatively small strip or tongue of land is extended from the main body along the eastern line north to the junction of the two creeks, with a view to reach the starting-point of the description in the grant. This was unnecessary, as we have seen, for the cutting down of the quantity to a league necessarily carried the north line further south than originally supposed. This northern line might have been closed with the eastern direct, instead of adopting the divergence north to the junction of the two creeks. But the quantity of land embraced in this strip is unimportant, is of no interest to any one except the Government, and scarcely any to it, as, if corrected, an equal quantity must be taken to make out the quantity in the grant from some other part of the public lands. Besides, the Government has not appealed.
To remit the case with directions that a new survey be made in conformity with the decree, and for the purpose of correcting this small error, would occasion delay and expense, and benefit no one.
The truth is, since the determination that the southern boundary of the tract was the Sierra, and not the Lomas Bajas, and that the eastern was a straight line, its direction southward to be controlled by the eastern base of the low hills, there is nothing left of this controversy worth contending for  scarcely merit enough to make it respectable.
DECREE REVERSED and the cause remitted, with directions *718 to enter a decree confirming the survey approved by Surveyor-General, 18th December, 1860.
Mr. Justice CLIFFORD dissenting.
I concur in the opinion that the true division-line between the rancho of Justo Larios and that of José Reyes Berreyesa is a straight line, and consequently that the decree in question should be reversed, but I dissent altogether from the directions given to the court below and from the reasons assigned in support of those directions. Some brief reference to the title-papers and to the facts and circumstances of the case is indispensable in order to a clear understanding of the nature of the controversy and of the grounds of my dissent from the views expressed in the opinion pronounced in behalf of a majority of the court.
I. Appellant, in his original petition to the commissioners appointed under the act of the 3d of March, 1851, prayed for the confirmation of his title to an undivided interest of three-fourths in a certain tract of land lying in the County of Santa Clara, in the State of California, and known as the Cañada de los Capitancillos, which, as he alleged, was contained within certain natural boundaries. When he presented the petition, he filed with it copies of the expediente and of the original grant under which he claimed, and his representation was that he held the title to the tract through certain mesne conveyances therein mentioned and described. Referring to the expediente, it will be seen that it consists of the petition of Justo Larios, the original donee of the tract, addressed to the Governor, together with the diseño and the usual marginal decree and the concession or vista la peticion and the titulo or original grant. Provisional grant of the land it seems had been made at some early period by the Ayuntamiento of the Pueblo of San José Guadalupe to one Leandro Galindo, who built a house on the premises and lived there for many years prior to the grant of Justo Larios, or to any application by him for the same. House of the occupant was north of the highway and pretty close to the southern base of the Pueblo Hills. Original *719 claimant, Justo Larios, in his petition to the Governor, dated at Monterey, on the sixteenth day of June, 1842, represented that he had purchased from the owner of the house all the right he had to the land by virtue of that provisional concession. Such provisional concessions, it is known, were often made, and that it frequently became necessary for a subsequent applicant for a grant of the same tract to purchase the improvements made by the occupant as a means of facilitating his own application. Petitioner describes the tract as a place known by the name of the Cañada de los Capitancillos, and states that the limits of said tract are from the boundaries of Santa Clara to the corral, called the corral of the deceased Macario. Decree of concession recites that Justo Larios is the owner in full property of a part of the land called Cañada de los Capitancillos, bounded by the Sierra, by the Arroyo Seco, on the side of Santa Clara, and by the rancho of the citizen José Reyes Berreyesa, which has for boundary a line commencing at the angle formed by the junction of the Arroyo Seco and the Arroyo de los Alamitos, thence southward to the Sierra, passing the eastern base of the small hill situated in the centre of the cañada.
II. Attention to the description given of the cañada, as contained in the concession, will show, especially when it is taken in connection with the language of the petition, that all of the boundaries of that part not previously granted are either expressly given, or so clearly indicated, as to amount to the same thing, and to leave no room for doubt as to the intention of the granting power. All will agree, I suppose, that the course of the Arroyo Seco, on the side of the church property called Santa Clara, was well known. Properties of that description were usually well defined, and there is not the slightest pretence of evidence in the case to show that this line was ever in dispute. West line of the tract is, therefore, fixed beyond peradventure. East line of it, as agreed on all sides, is the west line of the rancho of José Reyes Berreyesa. Controversy arose at one time between the original proprietors of those ranchos as to that division-line; *720 but it was duly settled by competent authority. Nothing need be added upon that subject, as I agree that the line should be a straight one, as assumed in the opinion of the court; but I insist that it commences at the angle formed by the junction of the Arroyo Seco and the Arroyo de los Alamitos, and runs south to the Sierra, wherever that may be. Beginning is at the angle formed by the junction of those two Arroyos, and that angle, as all must agree, is north of the house built by Leandro Galindo, and close to the base of the Pueblo Hills, on the northern side of the cañada. Larios purchased that house and the adjacent improvements, and was living in the house when he presented his petition to the Governor, and when the grant was made. He asked for the valley, alleging that he had occupied it "since the year 1836;" and it was part of the valley which was granted to him, as will presently more fully appear. Rancho of José Reyes Berreyesa lies east of this tract, and of course the west line of that rancho is the east line of the claim under consideration. Grant to José Reyes Berreyesa is the elder grant, and as the tract in question is bounded on that rancho, it is both proper and necessary to refer to the title-papers in that case, and to look at the actual location of that grant upon the land, to aid in the solution of the present controversy. Grantee, in that case, became possessed of a part of the same cañada or valley, in the year 1834, under a grant from Governor Figueroa, and he continued to occupy it with his family until 1842, and perhaps later. During that year he complained to the Governor that his neighbor, Justo Larios, had disturbed his possessions, and prayed that there might be granted to him two sitios of the valley, extending from the house of Justo Larios to the matadero or slaughter-house, erected by him at the easterly end of the valley, "with all the hills that belong to the cañada." Commissioners confirmed his claim for one league, and on appeal the decree was confirmed by the District Court. Appeal was thereupon taken to this court, and this court held that the concession and titulo described a parcel of land included within natural boundaries, but that the conditions of the grant con *721 fined it to a single league in quantity, and affirmed the decree of the District Court, ordering "the land to be located according to the description, and within the boundaries set out in the original grant, and delineated on the map contained in the expediente."[*]
III. All, or nearly all, the improvements made by the claimant in that case also were north of the camino or highway, and close to the Pueblo Hills on the northern side of the valley. He built two houses, and they were and are both situated nearly as far north as the angle formed by the junction of the before-mentioned arroyos. Northern boundary of the cañada, therefore, was evidently understood by the grantees of both these ranchos to be, what it is in truth and faith, the southern base of the Pueblo Hills. Southern boundary of the cañada is described as the Sierra, and much effort is expended in the attempt to prove that by the word Sierra is meant the Sierra Azul, or the main Sierra. Be that as it may, still, in my view of the case, the opinion of the court is clearly founded in error.
But I deny that the cañada, or valley, as described in the title-papers, and as understood either by the respective petitioners, or by the granting power, extended southwardly beyond what are called the Lomas Bajas, or low hills. Those hills, or certain portions of them, are seventeen hundred feet above the level of the Bay of San Francisco, and might well have been regarded by the petitioners and the Governor as the northern base of the main Sierra. Evidence shows that there is no table-land between those hills and the main Sierra, which is called the Sierra Azul, and that they are only separated from the higher range by a narrow, broken, irregular gorge, which forms the bed of the Arroyo de los Capitancillos, through which tumble the waters of that stream on their way from their source in the highlands to the southern skirt of the valley below, which takes its name from the name of the arroyo by which it is watered. Party then interested asked for the sobrante of the cañada lying *722 between the Arroyo Seco, on the side of Santa Clara, and the rancho of José Reyes Berreyesa; but the Governor refused to make the grant in that form, but limited it to one sitio de ganada mayor, or to one league of a larger size.
IV. Application was for the sobrante of the cañada; but if the quantity of the table-land was insufficient to meet the requirement of the grant, then there would be some show of reason for giving the document a more liberal interpretation, so as to include within the boundaries the quantity granted. No such difficulty, however, arises in the case, because, in any view taken of the subject, the quantity included within the out-boundaries is more than double the quantity to which the claimant is entitled.
Stripped of all side issues, therefore, the only question is, whether the grant which was for the lands of the valley shall be located there or upon the mountain, which is the southern boundary of the valley where the land lies for which the petitioner asked when he made his application to the Governor.
V. Suppose it were otherwise, and that the main Sierra, or Sierra Azul, is really the southern boundary of the valley, still I maintain that the directions given to the court below to enter a decree confirming the survey of the twentieth of December, 1860, are plainly and clearly erroneous. Operation of those directions, when they are carried into effect, will be to locate the principal portion of the claim upon the Lomas Bajas, and to exclude all the table lands except the narrow strip called in the opinion of the court a tongue, which is more than a mile in length, and only from twenty to thirty rods in width, and borders on the west line of the adjacent rancho. Survey apparently was commenced at the main Sierra on the line of the rancho of José Reyes Berreyesa, and runs northwardly on that line entirely across the valley to the angle formed by the junction of the Arroyo Seco and the Arroyo de los Alamitos, whereas it should have been commenced at the angle formed by those two arroyos, and run south for quantity, so as to have included the valley for which the petitioner asked when he applied to the Governor *723 for the grant. Having determined to commence south and run north for quantity, it became necessary to make that narrow strip or tongue, else one of two things would follow which must be avoided. Either the tract would not include the house of the claimant, or it would exceed the quantity of one league if it included the quicksilver mine. Apparently it was a sine quâ non that it should include the mine, and it was doubtless thought desirable that it should also include the house of the claimant, because it must have been known that the usages and customs of the country required it in the location of such grants.
Besides the recital of the concession is, that the rancho of José Reyes Berreyesa has for boundary a line commencing at the angle of the two arroyos before mentioned, and it may be that it was thought proper to have some regard to that recital. But it would not do to take more than a narrow strip of the valley, because if more was taken, either the mine must be excluded or the quantity would be too great, and hence all the residue of the table lands must be excluded. Boundaries in the grant are the same as those given in the concession, and consequently are subject to the same observations. Second condition of the grant is, that the donee shall solicit the proper judge to give him juridical possession in virtue of the decree, by whom the boundaries shall be measured out; and he shall put on the boundaries, in addition to the landmarks, some fruit trees or useful forest trees. Third condition describes the land as one league of the larger size, and the requirement is that the judge who shall give the possession shall have the land measured in conformity to law, leaving the surplus which remained to the nation. Land commissioners confirmed the claim for one league, but on appeal taken by the claimant to the District Court that decree was reversed, and a decree entered confirming the claim as one for the whole tract with specific boundaries. Whereupon an appeal was taken to this court, and this court reversed that decree, and decided that the claim was for one league of land, to be taken within the southern, western, and eastern boundaries designated therein, *724 and which was to be located at the election of the grantee or his assigns, under the restrictions established for the location and survey of private land claims in California, by the Executive department of the Government. Plainly this court then decided that the grant in this case was not one by specific boundaries, but was a grant by quantity, to wit, for one league of land. And the court go on to say that the external boundaries designated in the grant may be declared by the District Court from the evidence on file, and from such other evidence as may be produced before it, and the claim of an interest equal to three-fourths of the land granted is confirmed to the appellee. Nothing can be plainer, I think, than the fact that it was the out-boundaries of the cañada that this court authorized the District Court to declare. Decree of the District Court then under revision declared the grant to be one of specific boundaries, and assumed to fix them, but this court reversed that decree and declared that the grant was not one of specific boundaries, but a grant for one league of land, and expressly declared that it was to be taken within the three boundaries named, and was to be located at the election of the grantee or his assigns, under the restrictions established for the location and survey of private land claims in California, by the Executive department of the Government.[*]
VI. Where there are no guides in the title-papers, and the claimant has made no improvement, nor done any act, as by sale of a part, or otherwise, to influence the decision as to the location, the regulations of the Executive department, as a general rule, allow the claimant an election as to the location within the external or out-boundaries of the tract or place described within the grant, subject to the qualification that he must take the land in a compact form, and as far as practicable, leave the residue in the same condition. But where the title-papers furnish a guide, or where he has built a house, or made other improvements on the claim, or where he has sold a part of his claim, very different rules *725 prevail. Locations under such circumstances are made to conform as near as may be to the intent of the granting power as indicated in the title-papers; always, however, subject to the qualification that it must include the improvements of the claimant, and, as far as is consistent with the public interest, be made to conform to the parts conveyed, so that the location may be in one body, and leave the public lands in the same condition. Reference undoubtedly was made by the court to these rules, when it is said that the location must be made under the restrictions established by the Executive department of the Government. These suggestions are sufficient, I think, to demonstrate beyond cavil, that the boundaries mentioned in the opinion of the court in that case, were the external boundaries, and that it was those boundaries which were to be fixed by the District Court, and not the specific boundaries of the claim, else there would have been nothing to which the restrictions established by the Executive department of the Government could be applied. Taking this view of the opinion in that case, it is clear and consistent, and if it had been followed the case would have been free from all embarrassment. Grant of claimant was declared to be a grant by quantity, to be located within certain out-boundaries, three of which were already ascertained, and it was left to the District Court to ascertain the fourth from the evidence on file, and such other evidence as might be taken by the parties, but the survey and location were to be made under the rules and regulations of the land department. Mandate of this court was that the decree of the District Court should be reversed, and that the cause be remanded with directions to enter a decree in the case in conformity to the opinion of this court. Opinion of this court was, as before stated, that an interest equal to three-fourths of the land granted should be confirmed to the claimant, and that the District Court should ascertain the northern boundary of the cañada, and when that was done, that the land department should make the survey and location. Cause was remanded; but the District Court, instead of following the mandate of this court, on the *726 eighteenth of October, 1858, entered a decree defining the specific boundaries of the claim.
VII. Appeal was taken to this court by the United States, but this court dismissed the appeal, holding that it was improvidently taken, and remanded the case for further proceedings to be had therein, in conformity to the opinion of this court. Decision in effect was that this court had no jurisdiction of the case, and hence the opinion of the court upon any matter connected with the merits of the controversy can hardly be regarded as authority; but it is not necessary to decide that point, as the court, in express terms, reaffirm what had been decided in the first case. Both decisions of this court in this case, therefore, show that the grant is one by quantity, to be located within the boundaries of the cañada, and I entertain no manner of doubt that such is the true construction of the grant. Such a claim should be surveyed and located under the rules and regulations of the Executive department, whether it be made by the Land Office or by the courts. Location as decided in the opinion of the court in this case will be in violation of every one of those rules and regulations, and will also be diametrically opposed to the opinions of this court in the two cases to which reference has already been made. These propositions, as it seems to me, are not refuted in the opinion just pronounced, even if they are not impliedly admitted; but the suggestion is that the District Court, in the decree of the eighteenth of October, 1858, decided that the grant was one with specific boundaries, and proceeded to fix them in the decree, and that the decree then entered is in full force and unreversed, and that inasmuch as the appeal taken by the United States was dismissed and no new appeal was taken, the decree is binding on this court, although it was contrary to the mandate of this court given in the same cause. Considering the peculiar nature of the jurisdiction in this class of cases, I cannot admit that doctrine. Proceedings in this class of cases are very different from the proceedings in suits at common law. Where the grant is of a tract by specific boundaries, there would be some force in the argument, because in *727 that class of cases it is incumbent upon the court not only to determine the question of confirmation, but also, if it be decided to confirm the claim, to determine the boundaries of the grant as a part of the original adjudication.
VIII. Such, however, is not the rule, and never was where the claim is what is called a floating claim, or where the grant is one by quantity, to be located within certain out-boundaries, embracing a larger tract than the grant. All the courts have to do in such cases is to decide the question of confirmation, and leave the location to the Executive department of the Government. Attention, however, is called to the act of the fourteenth of June, 1860; but the answer to that reference is, that the provisions of that act have nothing to do with the decree of the District Court, entered on the eighteenth of October, 1858, nearly two years before the act was passed. Opinion of the court undertakes to vindicate the directions given in the cause, not upon the ground that the provisions of that act apply in the case, but upon the ground that the prior decree of the District Court had the effect to determine the controversy, and really that no further survey and location are necessary. Questions of this magnitude cannot be evaded, and ought not to be under any circumstances. Having given the subject all the consideration in my power, I am of the opinion that all that part of the decree of the District Court, rendered on the eighteenth of October, 1858, which attempts and professes to fix the boundaries of the claim in this case, was coram non judice, and utterly void. Reluctant as I am to differ from the majority of the court on this occasion, still I have much satisfaction in reaching that conclusion; because, if twenty millions of property must pass from the United States to those who have no pretence of title to it, I am not willing to cast the blame of such a monstrous result upon the office of the Attorney-General, or to place my decision in such a cause upon a mere technicality. Patient and thorough investigation has convinced me that the title to the quicksilver mine is in the United States, and it shall never pass into other hands by my vote while that conviction *728 remains, although I may stand alone. If this great wrong must be done, I would that it could have been done upon some other ground; for it seems that, in the opinion of the court, the case has been pending six years since it was finally and conclusively decided, which is an anomaly, perhaps, never before witnessed in a judicial tribunal. In my view of the case, the decree of the court should be reversed, and the cause remanded, with directions to order a new survey under the rules and regulations of the Executive department of the Government.
NOTES
[*] United States v. Fossat, 20 Howard, 413; Same v. Same, 21 Id. 445.
[*] United States v. Fossat, 21 Howard, 445
[] Reported 20 Howard, 413
[*] 21 Howard, 447.
[*] 21 Howard, 445.
[] 2 Stat. at Large, p. 441; §§ 6, 7.
[] 4 Stat at Large, 494.
[*] United States v. Heirs of Berreyesa, 23 Howard, 499.
[*] United States v. Fossat, 20 Howard, 427.